UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
IN DIVERSITY

BC 39 PTY, LTD., an Australian Company,
Plaintiff,                                                               CASE NO: 0:15-CV-62187

v.

STRIKE MARINE SALVAGE SALES, INC.,
Defendant.                                                        /
STRIKE MARINE SALVAGE SALES, INC.,
Third-Party Plaintiff,

v.

DAVID A. MACKAY d/b/a D.T. Diesel,
Third-Party Defendant.                                     /
DAVID A. MACKAY d/b/a D.T. Diesel,
Fourth-Party Plaintiff,

v.

DIESEL SERVICES OF AMERICA, INC., a Florida
Corporation, and MAN ENGINES & COMPONENTS,
INC., a Delaware Corporation, MAN CAPITAL
CORPORATION, a Delaware Corporation, and RING
POWER CORPORATION, a Florida Corporation.
Fourth-Party Defendants.                                 /

**DEFENDANT DAVID A. MACKAY D/B/A D.T. DIESEL'S DAUBERT
MOTION TO STRIKE MEC'S EXPERT FRANK GRATE**

COMES NOW the Third-Party Plaintiff, DAVID A. MACKAY d/b/a D.T. Diesel

("MACKAY"), by and through its undersigned counsel, and in accordance with Federal Rules,

files this, its Daubert Motion to Strike MEC's Expert Frank Grate, testimony regarding:

**I.  UNDERLYING FACTS**

1.      At issue are two MAN Marine Diesel engines, model number D2842LE404 ("Engines"),

which were sent to Defendant STRIKE MARINE SALVAGE SALES, INC ("SMSS") in the State of Florida from Australia for rebuilding. Plaintiff, BC 39 Pty, Ltd, contracted SMSS who engaged MACKAY in the rebuild of the Engines.

2. Fourth-Party Defendant MAN ENGINES & COMPONENTS, INC. ("MEC") is a Delaware corporation in the business of importing, distributing and selling marine diesel engines, which are manufactured by MAN Truck and Bus AG ("MAN"), and selling associated parts and services for MAN products.

3. MEC is the sole distributor in the U.S.A of marine diesel parts sold as MAN. MAN is the operational owner of MEC.

4. Diesel Services of America Inc. ("DSOA") is an exclusive MAN dealer and sold 48 connecting collar bolts to MACKAY. The invoice [DE112-3] for these 48 bolts was for a total of $880.25.

5. The port engine failed while dyno-tested. During the disassembly of the port engine, the bolts were removed and there were noted differences on the heads of the bolts; some of the bolts had markings and some did not. The bolts were then tested and the finding showed that there were noted differences [DE93-3].

6. At the inception of this matter, MEC denied ownership of the bolts because "they did not have the markings, and there was a physical difference that was noted," [DE194-1, p.114:17-18].

7. Shortly after the deposition, MEC filed an errata sheet in which MEC's corporate representative testified "on Monday, July 25, 2016, it first came to my attention that MAN ENGINES AND COMPONENTS, INC. has imported and sold connecting rod bolts that do not have any markings on them." [DE101].

8. The unmarked bolts came from Max Mothe, MAN's supplier of bolts beginning in

August 2012. See Exhibit 1, MEC's Answer to MACKAY's Interrogatories, ¶2.

9. MEC has since provided MAN results from tests performed on Max Mothe bolts; these have been marked confidential. MACKAY has translated these test results twice by certified translators. MEC objects to the filing of the same. [See DE161, DE163, DE170, DE179]. These documents will be listed as Trial Exhibits.

10. MACKAY has provided with a timely expert disclosure and Expert Report, delineating the initial Opinions and analysis of the bolts and test results provided by MEC. See Exhibit 2 &3.

11. On or about March 6-7, 2017, the parties performed a joint inspection of the bolts pursuant to an agreed to protocol [DE186-1]. At said time, the parties had agreed that Frank Grate, from QC, was an independent lab which was to undertake the metallurgy testing of the bolts with all parties or their representatives present. [See DE225]

12. Shortly after the bolt inspection and after the initial expert disclosure deadline, MEC amended its Expert Disclosure, naming Frank Grate from QC as an Expert. [See DE225-10]

13. On March 29, 2017, Honorable Magistrate Snow denied MACKAY's Motion to Strike Frank Grate as an expert as premature and based on :

> MEC has agreed that Mr. Grate can consult with any of the other parties as they jointly retained him. MEC has also assured the parties that they will have immediate access to Mr. Grate's work product.
>
> According to Mackay, Mr. Grate and QC Metallurgical were retained as an independent lab. A lab report, according to Mackay, should contain facts, not opinions. He argues that allowing Frank Grate to testify as an expert would be more prejudicial than probative and would create a substantial risk of harm to Mackay. Further, Mr. Grate's testimony as an expert would create a substantial risk of confusion of the issues and could mislead the jury.
>
> Mackay's motion is, at best, premature. It appears that Mr. Grate has not yet submitted his report, and perhaps for that reason, Mackay offers no more than conclusory assertions of prejudice in his motion. Accordingly, the Court will not strike Frank Grate as an expert witness.

[DE246]

14.  MACKAY also filed a Motion to Compel Compliance for bearing specifications or alternatively to Prohibit the Parties from submitting bearing as a cause of the failure [DE225]. The Court also found these Motions to be premature:

> **IV. Mackay's Motion to Compel Compliance with Order on Bearing Specifications**
> On February 9, 2017, the undersigned entered an order directing MEC to obtain bearing specifications and produce them to Mackay if the bearings become implicated as a possible cause of the engine failure. MEC has obtained the bearing specifications but refuses to produce them arguing that they are privileged, trade secret documents, which do not have to be produced unless the bearings become implicated in the engine failure. Because no expert has yet taken the position that the bearings caused or contributed to the engine failure, MEC need not produce the specifications. The Court agrees with MEC that this portion of Mackay's motion also is premature.
>
> **V. Mackay's Motion to Prohibit the Parties to Submit Expert Testimony Implicating the Bearings as the Cause of the Engine Failure**
> Because no expert has yet offered an opinion implicating the bearings as a contributor to the engine failure, this motion also is premature. Also, although Mackay fears that the rebuttal reports will be submitted after the deadline for Daubert motions, MEC represents to the Court that these can be completed promptly after the inspections and finalized before the Daubert deadline.

[DE246]

15.  As of April 3, 2017, the deadline for Daubert Motions, the bearings tests have not been performed. The undersigned notes that, despite the other parties' representations, it is not responsible for QC's delay or lack of performance of bearings testing on February 13, 2017 (as noted in this Court's Order DE246). See Exhibit 4.

16.  On March 29, 2017, at around 7:18 pm, MEC emailed Frank Grate's report, which reads as follows in respect to the bearings and bolts:

CONCLUSION

> The unit failed from very high stresses. The bearings all indicated being too thin and the bearing caps revealed signs of fretting indicating vibration. This **could** be from the bearings, torque values and **possibly** insufficient lubrication. It is also

> **possible** that something happened to the Dynamometer which created very heavy loading. The bolts did have some laps which would typically be rejectable but did not indicate that they caused this failure. The secondary cracks in the bolt sections are the result of high bending loads during failure. The secondary cracks are on one side and indicate high bending. Bolt No. 1 reveals the most secondary fatigue cracks and would likely to have been the first to have failed. The bolts did have some laps but the general structure and strength were good as was the quality of the steel. The dimensions still need be taken and some analysis on the bearings themselves recommended.

See Exhibit 5.

17. Frank Grate fails to opine to a degree of certainty required by a so-called expert. Here, it is reasonable that Mr. Grate would not be able to ascertain the cause of the failure: Mr. Grate was not present for the three tear down inspections during litigation, or the other inspections performed at other facilities. Mr. Grate, further, is not privy to any testimony or data that an expert would require to opine on the causation of the failure.

18. Had Mr. Grate not become an expert after agreeing to be an independent lab, he would have been able to address what he saw:

> The bolts did have some laps which would typically be rejectable… The[re are] secondary cracks in the bolt sections ... The secondary cracks are on one side and indicate high bending. Bolt No. 1 reveals the most secondary fatigue cracks and would **likely** to have been the first to have failed. The bolts did have some laps but the general structure and strength were good as was the quality of the steel.

See Exhibit 5. Mr. Grate is no longer an independent fact witness with expertise, but a disputed named-expert and must meet the Daubert standard to testify.

19. As expected, that is not what occurred, Mr. Grate proceeded to make a list of possibilities based on his limited review of the matter. There is a substantial risk of confusion of the issues and the jury will be misled to believe Mr. Grate, as a metallurgist, can determine an engine's failure from a limited review of parts of the engine.

20. MACKAY has also disclosed its mechanical engineer's expert report, who has attended

several inspection and has performed a thorough review of the parts of the engines. See Exhibit 6.

21. As noted by Mr. Grate "The bolts were chemically analyzed and the data is in Table Ill. There was no specification given to the actual requirements and are not known at this time." Further, Mr. Grate continues to make assumptions without noting what standard he utilizes: "There was more than one lap in each bolt but many of them were above the pitch line which would not be rejectable." See Exhibit 5.

22. Frank Grate admittedly attended one half day inspection of the bearings at the QC location, on February 13, 2017, when "one of the other experts used a micrometer and measured the thickness of the starboard engine bearing shells. The thickness data is contained in Table I. Which of the experts did the measurements is unknown at this time." See Exhibit 5. No proper methodology or standard for measurement was provided by Frank Grate in his report. No protocol on where the bearings require measurement has been noted by Frank and most importantly, MEC has failed to provide the bearings specifications as required by this Court's Order [DE175].

23. Frank Grate admits that the "failed engine bearings were too damaged to measure accurately." Exhibit 5. More importantly, "the dimension testing has not been completed." Exhibit 5.

## II.   ARGUMENT & LAW

**A.**   *Daubert* **Standard**

The prevailing test for admissibility of expert testimony was formulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Pursuant to *Daubert*, the Court is tasked with assessing the reliability of an expert's evidence and

testimony, and must perform a "gatekeeping" role. Further, Federal Rule of Evidence 702, governing the admissibility of expert evidence, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> **(1) the testimony is based upon sufficient facts or data;**
> **(2) the testimony is the product of reliable principles and methods; and**
> **(3) the witness has applied the principles and methods reliably to the facts of the case.**

Additionally, this Court has recognized that "[t]he Eleventh Circuit has adopted a three part analysis for determining whether expert testimony is admissible under *Daubert* and Federal Rule of Evidence 702. Under this analysis, expert evidence is admissible if the court finds: (1) *the expert is competent and qualified to testify regarding the matters that he intends to address;* (2) *the methodology by which the expert reaches his conclusions is sufficiently reliable*; and (3) the expert, through scientific, technical or specialized expertise, provides testimony that will assist the trier of fact to understand the evidence or determine a fact in issue." *Sternbenz v. Anderson*, 2012 WL 5387885 at *2 (M.D. Fla. Nov. 2, 2012) (relying upon *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-1341 (11th Cir. 2003)) (emphasis added).

The *Daubert* standard, as applied by the federal courts, requires that the trial court must act as a "gatekeeper" to exclude "junk science" that does not meet the evidence code's reliability standards, by making a preliminary determination that the expert's testimony is reliable under Rule 702, Federal Rule of Evidence. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147-48, 119 S.Ct. 1167 (1999); *GE v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512 (1997); *Daubert,* 509 U.S. at 589-90, 592-93. This "gatekeeping" function "inherently require[s] the trial court to conduct an exacting analysis" of the foundations of expert opinions to ensure they meet the

standards for admissibility under Rule 702. *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1257 (11th Cir.2002). In this regard, the United States Supreme Court has noted that "the inquiry envisioned by Rule 702 is ... a flexible one." Nevertheless, the Court has also emphasized that "the focus, of course, must be solely on *principles and methodology,* not on the conclusions that they generate." *Daubert,* 509 U.S. at 594-95 (emphasis supplied). An expert's own self-serving assertions that his conclusions are reliable and derived by a valid methodology do *not* satisfy Plaintiff's burden, and independent validation is required. *See Daubert,* 43 F.3d 1311, 1319 (9th Cir. 1995) (on remand).

B.   **Mr. Grate's Opinions Are Not Based on a Reliable Methodology and Are Not To A Degree of Certainty Required by An Expert as They Are Not Based Upon Sufficient Facts Or Data.**

Further, MEC must demonstrate that the methodology by which the Mr. Grate reached his conclusions is sufficiently reliable. *See Sternbenz*, 2012 WL 5387885 at *2. Or, to phrase it another way, MEC must demonstrate that its expert's "findings and conclusions are based on the scientific method, and, therefore, are reliable." *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

As noted above, Mr. Grate's Report does not identify "facts or data considered" by Mr. Grate in reaching the conclusory opinions which stated in his report as required by Rule 26, F.R.C.P. The report notes many possibilities but does little to narrow the issue for the jury and therefore does not help the jury:

> The unit failed from very high stresses. The bearings all indicated being too thin and the bearing caps revealed signs of fretting indicating vibration. This **could** be from the bearings, torque values and **possibly** insufficient lubrication. It is also **possible** that something happened to the Dynamometer which created very heavy loading. The bolts did have some laps which would typically be rejectable but did not indicate that they caused this failure.

Exhibit 5. It is apparent from Mr. Grate's Report that the opinions were not based on the

scientific method or any independent investigation conducted of the entirety of the engines. Rather, Mr. Grate bases his opinions solely on multiple possibilities which "could" have caused the failure.

It is well settled that a court should exclude expert testimony that presents any legal conclusion or legal opinion, or attempts to apply any legal standard or law to the facts of the case. *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003). That is, "an expert may not, however, merely tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). Mr. Grate's opinion must be stricken: "The bolts did have some laps which would typically be rejectable but did not indicate that they caused this failure."

Under *Daubert*, general expertise itself is insufficient. An expert must also possess "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho*, 526 at 156, quoting 4 McLaughlin, Weinstein's Federal Evidence §702.05[l], p. 702-33 (2d Ed. 1998). And most importantly, the testimony must be based upon sufficient facts or data. Federal Rule of Evidence 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S. Ct. 1167, 1178, 143 L. Ed. 2d 238 (1999) (upholding ruling that "excluded the testimony because, despite those qualifications, it initially doubted, and then found unreliable, "the methodology employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis.")

Here, there is no question that Mr. Grate was initially hired for a narrow scope, the metallurgy of the bearings and bolts. Mr. Grate has failed to perform the bearings test by the Daubert deadline and MEC has provided an expert report which gives multiple speculative opinions on the cause of the failure, which is unfounded and is not based on sufficient data or

evidence.

## VII.  CONCLUSION

MACKAY respectfully submits that MEC's expert, Frank Grate, must be excluded from testifying.  Mr. Grate has made no effort to establish a predicate for the causation of the failure and has simply made a list of all the possibilities whereby an engine can fail. Mr. Grate's testimony would not be helpful to trier of fact and and the prejudicial effect outweighs the probative value of the statement made.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 3rd day of April, 2017, on all counsel of record identified on the Service List via E-mail.

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

By: /s/ Jackeline S. Rodriguez
**Jackeline S. Rodriguez, Esq.**
Fla. Bar No.: 70435
9300 South Dadeland Blvd., 4th Floor
Miami, Florida 33156
(305) 670-1101 (Office)
(305) 670-1161 (Fax)
jackeline.rodriguez@qpwblaw.com

**SERVICE LIST**

| | |
|---|---|
| **Robert D. McIntosh (FBN 115490)**<br>rdm@mcintoshschwartz.com<br>**Adam B. Cooke (FBN 0634182)**<br>acooke@mcintoshschwartz.com<br>**McIntosh Schwartz P.L.**<br>888 SE 3rd Avenue, Suite #500<br>Fort Lauderdale, FL 33316-1159<br>Phone: (954) 660-9888<br>Fax: (954) 760-9531<br>kbrown@mcintoshschwartz.com<br>wxs@mcintoshschwartz.com<br>*Attorney for Plaintiff, Price* | **Christopher R. Fertig (FBN 218421)**<br>chris.fertig@fertig.com<br>linda@fertig.com<br>**Darlene M. Lidondici (FBN 516521)**<br>dml@fertig.com<br>jean@fertig.com<br>valerie@fertig.com<br>**Kristen M. Susik (FBN 117974)**<br>kms@fertig.com<br>ana@fertig.com<br>**Fertig & Gramling**<br>200 Southeast 13th Street<br>Fort Lauderdale, FL 33316<br>Phone: 954-763-5020<br>Fax: 954-763-5412<br>*Attorneys for Defendant Third Party Plaintiff, Strike* |
| **Steven R. Adamsky (FNB 329551)**<br>jadamsky@mitrani.com<br>**Elana B. Goodman (FNB 145076)**<br>egoodman@mitrani.com<br>mreinat@mitrani.com<br>Service@mitrani.com<br>**Mitrani, Rynor & Adamsky, P.A.**<br>1200 Weston Road<br>Penthouse<br>Weston, FL 33326<br>Phone: (954) 335-1010<br>Fax: (954) 335-1017<br>*Attorneys for Defendants MEC* | **F. David Famulari (FBN 860506)**<br>dfamulari@valcourtlaw.com<br>ckp@valcourtlaw.com<br>**Valcourt and Famulari, P.A.**<br>2332 Galiano Street, 2nd Floor<br>Coral Gables, FL 33134<br>(305) 728-7074<br>Fax: (305) 470-7484<br>Cell: (305) 968-8894<br>*Attorneys for Defendant DSOA* |
| **Kenneth W. Waterway (FBN 0994235)**<br>kww@waterwayblack.com<br>firm@waterwayblack.com,<br>kelsey.black@waterwayblack.com<br>**Waterway Black, P.A.**<br>1401 E. Broward Blvd.,<br>Victoria Park Centre, Suite 204<br>Ft. Lauderdale, FL 33301<br>Direct Line: (954) 320-6021<br>Phone: (954) 320-6220<br>Fax: (954) 320-6005<br>www.waterwayblack.com<br>*Attorneys for Ring Power* | **Jackeline S. Rodriguez (FBN 0021905)**<br>Jackeline.rodriguez@qpblaw.com<br>Veronica.meadows@qpblaw.com<br>**Jay D. O'Sullivan (FNB 070435)**<br>josullivan@qpwblaw.com<br>mbarquero@qpwblaw.com<br>**Quintairos, Prieto, Wood & Boyer, P.A.**<br>9300 South Dadeland Blvd., 4th Floor<br>Miami, FL 33156<br>Phone: 305-670-1101<br>Fax: 305-670-1161<br>*Attorneys for Mackay/DT Diesel* |